## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 1:19-cr-00015-WES-PAS |
| | : | |
| HAROLD RUSSELL TAUB, | : | |
| | : | |
| *Defendant.* | : | |

## DEFENDANT'S SENTENCING MEMORANDUM AND
## REQUEST FOR A SENTENCE BELOW GUIDELINES

Pursuant to Title 18 U.S.C. § 3553(a), Rule 32, Federal Rules of Criminal Procedure, and Section 6A1.3 of the United States Sentencing Guidelines, Defendant Harold Russell Taub, by counsel, hereby states that he has received and reviewed the Presentence Report ("PSR") prepared in this case and that he respectfully requests that the Court impose a sentence below the range calculated according to the advisory Sentencing Guidelines.

### I.   Introduction

Now comes Harold Russell Taub ("Russell"), the Defendant in the above-captioned matter, and moves this Honorable Court to consider and impose a sentence that is sufficient but not greater than necessary, in compliance with 18 U.S.C §3553(a).  Specifically, for a variety of factors discussed in detail below, a sentence below the Sentencing Guidelines (the "Guidelines") range would be sufficient to serve the interest of justice.  Chief among these reasons is ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Russell takes full responsibility for his actions and is deeply sorry for the hurt he has caused.  He is prepared to accept whatever penalty the Court imposes, and he is determined to

dedicate the next phase of his life to making amends for his crimes.[1]  However, none of this is possible if Russell is destroyed as a person in the process as a result of incarceration in a prison. Both he and the public benefit from imposing a penalty that not just punishes him but which results in his being a contributing member of society.  As Russell's mother Claire Taub so eloquently put it in her letter to the Court:

> I pray every day for a resolution that will not only be just but also compassionate.  I am hoping that the Court will see a way to help Russell learn from his mistakes and allow him to continue to receive the support he needs to actualize his true potential.  I love my son.  He is young.  I want, more than anything else, for him to be able to go on with his life and be a productive human being.  Those of us who know him and love him recognize that he has that potential.  I am hoping that the court will recognize that too.

See Exhibit B attached hereto.[2]

A sentence of 24 months in a halfway house, 18 months of probation and restitution of up to $100,000 is a sufficient but not greater than necessary sentence under 18 U.S.C §3553(a).

## II.    A Sentence of 24 Months in a Halfway House, 18 Months of Probation, and Restitution of up to $100,000 is a Sufficient But Not Greater than Necessary Sentence Under § 3553(a)

Russell acknowledges and admits to committing a serious crime. He has pleaded guilty to an Information charging him with one count of wire fraud in violation of 18 U.S.C. § 1343, and one count of violating the Federal Election Campaign Act, in violation of 52 U.S.C. §§ 30104 and 30109.

Russell accepts full responsibility for the crimes and should receive a non-Guidelines sentence which, as discussed below, is a common practice for defendants similarly situated in the District of Rhode Island.

---

[1] Russell's letter of apology is attached hereto as Exhibit A.
[2] Exhibit B includes two letters of support. One from Russell's mother, Claire Taub, and another from his older brother, Alex Taub.

Beyond the statutory limits set forth in 18 U.S.C. § 1343, 52 U.S.C. §§ 30104, and 30109, the starting point for a sentencing Court in determining a sentence is 18 U.S.C. § 3553(a), which requires the Court to "impose a sentence sufficient, but not greater than necessary," on a defendant.  Section 3553(a) provides:

> (a) Factors to be considered in imposing a sentence.  The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed shall consider— (emphasis added)
>
>> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>>
>> (2) the need for the sentence imposed—
>>
>>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>>
>>> (B) to afford adequate deterrence to criminal conduct;
>>>
>>> (C) to protect the public from further crimes of the defendant; and
>>>
>>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>>
>> (3) the kinds of sentences available;
>>
>> (4) the kinds of sentence and the [applicable] sentencing range . . .;
>>
>> (5) any pertinent policy statement . . . ;
>>
>> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>>
>> (7) the need to provide restitution to any victims of the offense.

The primary sentencing mandate of §3553(a) directs the sentencing court to impose the sentence minimally sufficient to achieve the statutory purposes of punishment, justice, deterrence, incapacitation and rehabilitation. Although they should be considered, the Sentencing Guidelines in this circumstance will not only not achieve the statutory purposes, they will undermine them and cause a grave injustice. Under the Plea Agreement between Taub and the United States Department of Justice (the "Government"), the Guidelines range is 33 to 41 months.[3] The PSR calculated the sentencing guideline range to be 41 to 51 months[4] in prison, adding an enhancement not included in the Plea Agreement and never raised by the Government.

The Supreme Court has ruled that the Guidelines are no longer mandatory but instead serve only an advisory function to the sentencing judge. See United States v. Booker, 542 U.S. 220, 245 (2005). Rather than mechanically following the Guidelines, the sentencing Court is granted considerable latitude in imposing a sentence based on the particular facts and law attendant to each case. See Gall v. United States, 552 U.S. 38, 59 (2007) and Kimbrough v. United States, 128 S.Ct. 558, 570 (2007). In fashioning the appropriate sentence the Court is bound to consider the sentencing factors set out in 18 U.S.C. § 3553(a). See United States v. Alli, 444 F.3d 34, 40 (1st Cir. 2006). Accord, United States v. Ossai, 485 F.3d 25, 32 (1st Cir.), cert. denied, 552 U.S. 919 (2007).

The calculated Guidelines range is advisory only and, while an important consideration for the Court beyond being just another factor in the Section 3553(a) list,

---

[3] While the Guidelines negotiated in the Plea Agreement calculate to an offense level of 20, the Government retained the right to argue that Russell engaged in a "sophisticated" means to carry out his scheme. For the reasons described in Section IV(2), Russell believes the Government's assertion is unfounded.

[4] For the reasons stated in Section IV(1) below, Russell believes the PSR has inappropriately inflated the Guidelines range.

4

cannot be considered presumptively controlling.  United States v. Jiminez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006).  Rather, once the Court calculates the applicable Guidelines range, it must then determine "whether other factors identified by either side warrant an ultimate sentence above or below the guideline range."  Id.  Where consideration of the totality of circumstances under the Section 3553(a) factors in a post-Booker analysis indicates a sentence outside the advisory Guidelines would be more appropriate and one "sufficient, but not greater than necessary," the Court should impose a "non-Guidelines"[5] or "variance"[6] sentence.

A "variance" outside the guideline range provided for in the Guidelines is one beyond consideration of only relevant departure provisions.  Gall v. United States, 552 U.S. 38 (2007).  Variances are not subject to the guideline analysis for departures.  See e.g. United States v. Fumo, 655 F.3d 288, 317 (3d Cir. 2011), as amended (Sept. 15, 2011).  In some situations, a prohibited ground for departure may be a valid basis for a variance.  See e.g. United States v. Chase, 560 F.3d 828 (8th Cir. 2009).

As the 1st Circuit stated in United States v. Martin, 520 F.3d 87 (1st Cir. 2008)

"The Gall Court ...made clear, though, that courts of appeals must grant district courts wide latitude in making individualized sentencing determinations, thus guarding against the institutionalization of an

---

[5] A non-Guidelines sentence is a sentence that is "neither within the applicable Guidelines range nor imposed pursuant to the departure authority in the [Sentencing] Commission's policy statements."  United States v. Crosby, 397 F.3d 103, 111 n. 9 (2d Cir. 2005); United States v. Ratoballi, 452 F.3d 127, 129 fn. 1 (2d Cir. 2006).

[6] In determining "'if a sentence serves the factors set forth in § 3553(a),' a court should determine, after calculating the initial guideline range, whether a traditional upward or downward departure under the guidelines would be appropriate; if so, the court may depart accordingly. If after this consideration the sentence rendered does not serve the § 3553(a) factors, a court may impose a 'variance sentence,' i.e., a sentence not within the advisory guideline range. The court may impose this variance sentence provided that the sentence falls within the statutory limits for the underlying offense and is 'reasonable.'."  United States v. Hampton, 441 F.3d 284, 287 (4th Cir. 2006).

impermissible    presumption    that    outside-the-range    sentences    are
unreasonable….A sentencing determination should begin with the calculation
of the particular defendant's GSR. As a final step in arriving at a defendant's
GSR, the district court must assess the appropriateness vel non of any
departures. See United States v. Dixon, 449 F.3d 194, 204 (1st Cir.
2006)….Properly calibrated, the GSR should serve as the sentencing court's
"starting point" or "initial benchmark." Gall, 128 S.Ct. at 596. Nevertheless,
the guidelines are only advisory, see Booker, 543 U.S. at 262, 125 S.Ct. 738,
and the sentencing court may not mechanically assume that the GSR frames
the boundaries of a reasonable sentence in every case. See Gall, 128 S.Ct. at
596-97. …the court should "consider every convicted person as an individual
and every case as a unique study in the human failings that sometimes
mitigate, sometimes magnify, the crime and the punishment to ensue." Gall,
128 S.Ct. at 598. "

Martin, 520 F.3d at 90-91.

Other than a few prohibited grounds, even pre-Booker the Guidelines "place[d]
essentially no limit on the number of potential factors that may warrant a departure." Koon v.
United States, 518 U.S. 81, 106, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).  Courts have held that
there are a "potentially infinite number of factors which may warrant a departure."  18 U.S.C. §
3661 provides that "[n]o limitation shall be placed on the information concerning the
background, character, and conduct of a person convicted of an offense which a court of the
United States may receive and consider for the purpose of imposing an appropriate sentence."

It has been constant in the federal judicial tradition for the sentencing judge to consider
every convicted person as an individual and every case as a unique study in the human failings
that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

In this circumstance, a sentence below the Sentencing Guidelines range would be
sufficient to serve the interests of justice. This Court regularly sentences defendants convicted of
similar crimes to non-Guidelines sentences, and one in the Guidelines range would be far greater
than necessary for those same interests.



In short, a Guidelines sentence in this instance will certainly punish Russell but it will ultimately destroy any chance he will have at being a whole human being and a contributing member of society, something from which he, society and victims can benefit.



### III.   <u>Mr. Taub's Background and the Plea</u>

#### 1. Mr. Taub's Background

Russell was adopted at birth after his birth mother died during delivery. Russell has become a devoted son and brother who, while growing up in a loving home, has had to deal with

more than his share of struggles. When Russell was only a toddler his mother, who has a doctorate in Communications Sciences and Disorders, realized that he had severe learning disabilities and developmental delays. These disabilities initially manifested themselves in delayed speech and difficulty following compound instructions, among others.

In an attempt to help young Russell's development, his mother enrolled him in a small Jewish day school. Even with closer attention, Russell had difficulties. He was eventually diagnosed with a Central Auditory Processing Disorder. Because of Russell's disorder, he had difficulty learning things that came much easier to his classmates.

Heading into high school Russell was once against evaluated and diagnosed with Central Auditory Processing Disorder and needed an individualized education program to receive special services and accommodations. In addition to this individualized education program, Russell required additional support, including outside tutoring, to successfully complete high school.

Russell's difficulties in school, particularly high school, went far beyond his ability to complete the coursework. His learning disabilities made it difficult for him to make close friends and he had a very hard time fitting in with his peers. Though Russell made efforts to fit in with kids his age, he was mostly unsuccessful and was the subject of bullying in school. ▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ At the same time, he also enrolled in Johnson and Wales University. It was after college that Russell became involved in politics because he thought he could have a positive impact on the community and believed in the concept of public service.

Though still a young man, Russell has been a sincere part of the legitimate political

process for the past several years.  Indeed, he was the Republican Party candidate to represent Rhode Island in the United States Congress in 2016, and there has been no suggestion of any improper diversion of funds or similar financial impropriety during his campaign. He was defeated but he ran a clearly legal and ethical issues-oriented campaign.

It was after this unsuccessful congressional run that Russell focused his attention on political fundraising in an effort to remain in the political arena. He began raising money for Republican causes through two PACs he created, Keeping America in Republican Control ("KAIRC") and Keeping Ohio in Republican Control ("KOIRC").

Russell's formation of the PACs was not done with the intent of using them as means to commit fraud, quite the contrary. The first was formed in December 2016, shortly after Russell lost the Congressional election, as part of his effort to keep himself involved in the political process.  And a substantial portion of the money raised through the PACs – well over a half a million dollars – was used to support political causes and campaigns.  Russell concedes that this support was not always in done in a manner and fashion allowed under FECA, and the PACs themselves did not properly register and report their actions, but for purposes of determining the proper sentence for wire fraud the important point for the Court to consider is that the scheme was not purely or at first a fraudulent one and a substantial portion of the funds were not diverted to his personal use.  The improper diversion of funds to Russell's personal bank accounts and use, which rendered the representations to donors fraudulent, was not Russell's initial plan.  It was not until Russell successfully began to raise large sums of money that he lost his way. When his actions are analyzed in the context of ███

████████████████████████████████████████████████████████████████████

███████████████████████████████████ As a result, while his subsequent behavior was

criminal, his original intent was honorable.

Russell's commitment to being part of the political process is passionate and genuine. However, this conviction in all likelihood ends any possibility of his continuing in this arena. Thus, any concern that Russell will return to this behavior is misplaced. As the Court considers what sentence is "sufficient, but not greater than necessary" to further the goals of Section 3553(a), Russell respectfully submits that his status as a convicted felon alone, with its attendant humiliation and closure of his previous participation in the political process, ends any possibility of his repeating his crimes without the lengthy period of incarceration recommended by the Guidelines.

Russell is not a career criminal, and indeed is far from it.  As reflected in his criminal history category, this is his first serious offense. The PACs were not created with the intent of being a vehicle for a criminal scheme.  Though he willfully did not follow proper legal procedures in their creation and operation, he did not create them to steal. ███████

███████

  In other words, Russell saw the money he raised through this scheme as a vehicle to buy access and hold himself out as "a player." He wanted to be important. Because of his intellectual and mental impairments, he simply did not know how to do it legally. This is not to say that Russell did not know it was wrong. He knew it was. It simply explains his limitations and inability at that point in his life to achieve his goal of being important by legal means. He did not have the mental or intellectual capacity. Most importantly, ████████████████████ ██████████████████████████████████ ██████████████████████

  It is critically important that regardless of the sentence imposed that Russell be able to access the ██████████████████████████████ ███████████████████████████████████ ███████████████████

███████████████████████████████ ███████████████████████████████ ████████████████████████████ █ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████████████████ ███████████████████

███████

### 2. The Plea

Pursuant to a plea agreement, Russell has pleaded guilty to a two count Information

charging him with (i) one count of wire fraud in violation of 18 U.S.C. § 1343, and (ii) one count of violation of the Federal Election Campaign Act, in violation of 52 U.S.C. §§ 30104 and 30109.  United States v. Taub, 19-cr-00015-WES-PAS, ECF No. 2. Briefly stated, Russell set up two political action committees, or "PACs," one in December 2016 called KAIRC and the other in March 2018 called KOIRC.  Neither PAC was registered as it should have been with the Federal Election Commission; nor did Russell ever make reports of receipts and disbursements of the PACs to the Federal Election Commission, as the law required.  Russell has admitted to willfully violating these requirements.  Furthermore, Russell solicited contributions to the PACs by making untrue statements regarding the operations of the PACs, including that (i) they had an all-volunteer workforce when he in fact was actually paying himself from them, (ii) 100% of donations were used to further candidates they supported, and (iii) in one case by using the name of a former Ambassador and high ranking military officer who had not given permission to use his name and whose name Russell continued to use for approximately four months after the individual had demanded Russell stop using it.[7]

The two PACs ultimately raised $1,630,439.  Russell wrongfully converted a substantial portion of that money to his personal use, giving rise to the wire fraud violation to which he has pleaded guilty.

### 3.  Mr. Taub's Proffer

What Russell did was wrong. He knows it, accepts responsibility for it, and wants to

---

[7] It is worth noting, however, that the former Ambassador did indeed endorse Russell in his run for Congress. It is not as if Russell was unknown to the Ambassador. Russell did not understand the limits of the endorsement. Even when the Ambassador through his attorney asked Russell to stop using his name, Russell continued using it not because he wanted to hurt the Ambassador but because he wanted to appear important. He knew it was wrong but it was more important to him to "be somebody."

make amends. Indeed, in addition to pleading guilty immediately, Russell even went so far as to proffer information to the Government along with his plea. As of this date, the Government has not used the information provided by Russell. The information Russell provided was voluntary, truthful and part of Russell's recent attempts to take responsibility for his actions. Thus, in assessing Russell as an individual to determine the appropriate sentence for him, it is important to note the totality of the circumstances of which Russell's crimes were a part, and his efforts to make things right.

### 4. Restitution

Russell's financial situation indicates he should only be forced to pay minimal restitution. As noted in the Plea Agreement, the government has already seized the minimal remaining proceeds from his crimes. See id, at 2-3. Additionally, as noted in the PSR, Russell currently has $289 USD in his checking account and credit card debt of $3,000 USD. See PSR, at Net Worth Short Form Statement. The only income he has is a $2,000 USD monthly allowance from his mother, almost all of which is spent on monthly rent, utilities, and credit card payments. See id. at Monthly Cash Flow Statement.

Russell wants to make amends for his wrongdoing. He is prepared to undertake a restitution order currently beyond his means and work towards complying with it upon his release. Notwithstanding his current inability to pay restitution, by ordering Russell to pay up to $100,000 in restitution, the Court will necessarily be extending his punishment because it will necessitate Russell having to pay the restitution over time. It will stand as a reminder of his criminal conduct, and a further deterrence of his ever doing it again. However, any possibility of Russell paying the restitution will be crushed if he is forced to go to prison and is ultimately destroyed as a human being. We submit that Russell's ability to pay any restitution rests on his

ability to function in society at the conclusion of his sentence. A halfway house, thus, achieves this goal.

18 U.S.C. § 3663 explicitly requires the Court to consider "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." Furthermore, 18 U.S.C. § 3664(2) provides the procedure for issuance of an order for restitution:

> (2) Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of--
>
>> (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
>>
>> (B) projected earnings and other income of the defendant; and
>>
>> (C) any financial obligations of the defendant; including obligations to dependents.

18 U.S.C.A. § 3664. Accordingly, courts decline to order defendants to pay restitution where the defendant will not be able to pay. United States v. Fuentes, 107 F.3d 1515, 1532-1533 (11th Cir. 1997) (Sentencing court could not order defendant to pay full restitution where court believed that defendant was likely not able to pay); United States v. Fogg, 666 F.3d 13, 18 (1st Cir. 2011) (declining to order any restitution because the defendant had considerable debts and would not be able to pay restitution); United States v. Hughes, 211 F.3d 676, 692 (1st Cir. 2000) (the district court considers the defendant's ability to pay by reviewing the defendant's financial information and earning ability, as contained in the presentence report); United States v. LiCausi, 167 F.3d 36, 52 (1st Cir. 1999) (same). Clearly, Russell has no assets and no ability to pay the more than $1.1 million USD restitution sought in the PSR even over the course of a long period

of time. <u>See</u> PSR at 19.

Furthermore, the court should take Russell's prospective future income in determining the amount of restitution he should pay. <u>United States v. Rostoff,</u> 164 F.3d 63, 70 (1st Cir. 1999) (considering how much money the defendants could reasonably have afforded to pay during supervised release); <u>United States v. Lilly,</u> 80 F.3d 24, 29 (1st Cir. 1996) (determining restitution based on prospective future income); <u>United States v. Fisher,</u> 962 F.2d 11 (7th Cir. 1992) (citing <u>United States v. Fountain,</u> 768 F.2d 790, 803 (7th Cir.), *opinion supplemented on denial of reh'g*, 777 F.2d 345 (7th Cir. 1985)) (same); <u>United States v. Seale,</u> 20 F.3d 1279, 1286 (3d Cir. 1994) ("In attempting to predict future ability to pay, district courts must be realistic and must avoid imposing a fine when the possibility of a future ability to pay is based merely on chance."); <u>United States v. Patty,</u> 992 F.2d 1045, 1052 (10th Cir. 1993) (citing <u>United States v. Grimes,</u> 967 F.2d 1468, 1473 (10th Cir. 1992)) (Court of Appeals "will not uphold district court's exercise of discretion if record is devoid of any evidence that defendant is able to satisfy the restitution order."). Russell likely will not have a high prospective future income based on his previous work experience and crimes. Russell has never held a full-time job and, because of his crimes, it is unlikely that we will be able to hold a job or career in the one area in which he has any experience; political fundraising. It also is unlikely Russell will be able to maintain a career with a high income level, making it virtually impossible for him to pay restitution of over $1 million USD. In his condition, an order of restitution could cripple his ability to ever maintain himself as a member of society.

It is worth emphasizing that very few victims came forward to request restitution, highlighting the fact that Russell's crimes did not result in large losses to individual victims. It also worth noting that of all the victims (over 160 by the Government's count), only 13 have

sought restitution. The remainder have either not responded, or responded to the Government by saying they were not victims and did not seek restitution. Indeed many, 10, have submitted letters to the court. These letters were written by Neil Bucci, Peg Bugara, Michael J. Bugara, Richard Fishpaw, Robert Garde, Terence Garvey, Larry Girouard, Michael Kiley, Thomas O'Malley, and Lawrence Sullivan. See Exhibit D attached hereto.[8]

### IV.   The Sentencing Guidelines Calculation and Enhancements

Under the terms of the Plea Agreement, without any enhancements, the Guidelines would yield a sentence of from 33-41 months in prison as a first-time offender and based upon an offense level of 20. Defendant's calculations and the PSR are, to this point, in agreement. There are, however, two potential enhancements that must be discussed. One has been raised by the PSR, the other by the Government.

### 1.   Enhancing the Guidelines by 2 Points Because the Scheme was Done in Connection With Political Activity Would be Fundamentally Unfair

In the PSR Paragraph 38, the Probation Department applied an additional 2-point enhancement under §2B1.1(b)(9)(A) for a "misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency." It is objectionable that the Probation Department seeks this 2-point enhancement, for at least two reasons.

First, the PSR acknowledges that the two offenses to which Russell pled guilty are being grouped together for guideline purposes under U.S.S.G. §3D1.2 (c). See PSR at ¶ 51. The PSR recognizes that "one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." In other words, Count 2 involves Willful Violation of the Election Act, by misusing a political

---

[8] Additional letters of support for Russell by non-victims have been attached as Exhibit E.

organization. For the PSR to then add a 2-point enhancement to Count 1, Wire Fraud, is clearly duplicative and punishing Russell twice for the same conduct and the same transactions.

Second, it would be fundamentally unfair for the Court to apply this 2-point enhancement to Russell's sentence. During protracted and detailed negotiations over the Plea Agreement between Russell's counsel and the Government, the Government failed to raise even a single time the potential for an enhancement under §2B1.1(b)(9)(A). This, despite the fact that Russell's conduct was investigated by the "Public Integrity Section" of the Department of Justice (the "DOJ"), the division specifically tasked with the responsibility for overseeing the "federal effort to combat corruption through the prosecution of elected and appointed public officials at all levels of government. The Section has exclusive jurisdiction over allegations of criminal misconduct on the part of federal judges and also supervises the nationwide investigation and prosecution of election crimes." See https://www.justice.gov/criminal/pin. Clearly, if the Government intended or believe it was important for an enhancement under §2B1.1(b)(9)(A) to apply, they would have brought it up during plea negotiations.

It would be now unfair for the Court to apply an enhancement that could have been raised by the Government but was not. Further, the Government acknowledges, as it must, that it is precluded from arguing for a two-point sentencing enhancement under §2B1.1(b)(9)(A). See U.S. v. Lawlor, 168 F.3d 633, 637 (2d Cir. 1999) (finding that while the government did not have to disavow the Probation Department's Presentence Investigation Report's higher Sentencing Guidelines offense level computation, "at the very least, to avoid any potential contravention of the plea agreement, the government should have informed the District Court that it could not take a position[.]"); see also U.S. v. Palladino, 347 F.3d 29, 34 (2d Cir. 2003) (holding that "the government breached the plea agreement by advocating a six-level sentencing

enhancement on the basis of information that was known to the Government at the time of the agreement, but was not reflected in the estimated offense level in the plea agreement.").

### 2. No Enhancement for Sophistication is Warranted

The Government now argues for a 2-point enhancement to the offense level, on the grounds of sophistication. The Government reserved this argument in the Plea Agreement. It would, however, be unwarranted in light of Russell's conduct.

The Sentencing Guidelines provide for an upward enhancement of two levels if in committing the offense the defendant employed "sophisticated means," which are defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense." See U.S.S.G. 2B1.1(b)(10)(C). To establish sophistication, Courts view the conduct in its "totality" to determine if it "was notably more intricate than that of the garden-variety [offense]." United States v. Hance, 501 F.3d 900, 909 (8th Cir. 2007). "Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts … ordinarily indicates sophisticated means." U.S.S.G. 2B1.1, cmt. n. 8(B). Here, there were no such efforts to hide assets or transactions. Russell's fraud was a garden-variety offense.

The enhancement applies where the defendant's conduct is "highly complicated." United States v. Montano, 250 F.3d 709, 715 (9th Cir. 2001) (quoting Webster's Third New International Dictionary 2174 (1993)); United States v. Johnson, 168 Fed. Appx. 294, 309 (10th Cir. 2006) (parenthetically noting the definition of "sophisticated" as "highly developed or complicated" (quoting Oxford English Dictionary (online edition) (taken from second print ed. 1989)). As the application note provides, the defendant's conduct must be "especially complex" or "especially intricate." United States v. Snow, 663 F.3d 1156, 1164 (10th Cir. 2012); United

States v. Hart, 324 F.3d 575, 579 (8th Cir. 2003) (same). Thus, the mere fact that that an offense involves some planning or attempts at concealing is insufficient by itself to justify an enhancement. Id; United States v. Bhagavan, 911 F. Supp. 351, 354-55 (N.D. Ind. 1995).

Even if conduct is not simple, it does not necessarily qualify as "sophisticated." Bhagavan, 911 F. Supp. at 355. Nor does repetitive conduct necessarily constitute the use of "sophisticated means." United States v. Kaufman, 800 F. Supp. 648, 655 (N.D. Ind. 1992). From the plain text of the Application Note, it is not enough that the scheme be complex or intricate. Rather, the Commission sought to modify the conduct through the adverb "especially." Thus, simple complexity or intricacy is insufficient to trigger the enhancement; either predicate activity must be "especially" so.

In United States v. Montano, 250 F.3d 709 (9th Cir. 2001), the court analyzed the sophistication of a particular smuggling scheme and U.S.S.G. § 2T3.1(b)(1), a two-level enhancement for sophisticated means in a smuggling operation. In overturning the imposition of the enhancement, the Court explained:

> Montano's activities represent a crude and very basic smuggling operation. Webster's dictionary defines "sophisticated" as "derived of native or original simplicity: as (a) highly complicated: many sided: COMPLEX." Webster's Third New Int'l Dictionary at 2174 (1993). This scheme was neither many sided nor complex. Furthermore, Montano's concealment activities were all inherent in the activity of smuggling. Smuggling by its nature, involves active steps to avoid detection. Therefore, applying the sophisticated concealment enhancement to a smuggling charge requires the conceptually difficult task of separating out those concealment activities that represent more 'sophisticated' concealment.

Id. at 715. In adjudicating the district court's analysis of Montano's case, this Court concluded: "The factors the district court relied on are common, not especially sophisticated, and were employed, not to conceal, but simply to carry out the smuggling scheme." Id.

19

Russell's scheme clearly does not meet the definition of sophisticated means in either the execution or the concealment of the offense. Russell's scheme was no more intricate than the garden-variety wire fraud. Wire fraud, by its nature, involves soliciting moneys using fraudulent or deceptive means. Russell's method of soliciting donations was not especially complex. The simple and common practice of moving moneys from one account into another is not only unsophisticated, it is common practice for all participants in the global economy.

Sophistication "requires more than the concealment or complexities inherent in fraud. Thus, fraud per se is inadequate for demonstrating the complexity required for an enhancement under U.S.S.G. § 2B1.1(b)(10)(C)." United States. v. Adepoju, 756 F.3d 250, 257 (4th Cir. 2014) (finding that the government failed to carry that burden of sophistication because Defendant's "use of forged checks and a stolen identity to attempt bank fraud is beyond dispute. Indeed, virtually all bank fraud will involve misrepresentation, which includes unauthorized acquisition and use of another's information."). Likewise here, Russell's actions of soliciting donations and then taking the donations for himself is per se wire fraud and nothing more.

Because Russell's wire-fraud was garden-variety and only involved a single simple step, the sophistication sentencing enhancement should not be applied. Courts have found sophistication where "even if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together so that [Defendant] could perceive and exploit different vulnerabilities in different systems in a coordinated way." United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003). This is not how Russell's scheme operated. The totality of Russell's scheme was simple and involved only a single step of soliciting donations (through email, social media, and mailings) into PAC accounts and then taking the donated money for himself. Russell did not create the PACs as part of an elaborate scheme to enrich himself. The

PACs, and the bank accounts associated with them, were part of a genuine attempt by Russell to remain involved in the political arena after his unsuccessful congressional run. It was only after he began his efforts that he began engaging in his criminal conduct. There were no coordinated steps, simple or complex, that made up the scheme.

Further, solicitation by mass-mailing and directing victims to a website is not considered sophistication in the execution of an offense. U.S. v. Executive Recycling, Inc., 953 F.Supp. 2d 1138, 1167 (D. Colo. 2013) ("the Court finds that the use of mass mailings hardly makes the fraudulent conduct sophisticated. If anything, mass mailings are inherently unsophisticated in the digital age."). In Hance, the court concluded the sophisticated means enhancement did not apply to a defendant who rented a post office box in an assumed name and included fake testimonials for his fraudulent "Wealth Building Program." Id. at 904. The defendant solicited an estimated 234,000 individuals to his program using a fraudulent promotional flier, which touted the program's legitimacy and legality. Id. The fraud lasted at least four years. Id. The Circuit Court reversed the district court's imposition of the enhancement, explaining that the mail fraud was not different enough from the typical case. Id. at 910. Similarly, Russell's use of mailings, email and social media is hardly sophisticated conduct.

Russell's solicitation of funds for the PACs through email, social media, and mailings and a website constitutes a simple marketing effort that can be easily replicated with the most rudimentary of technology skills. In the modern era, setting up email accounts, social media accounts, and a website takes no more than a few clicks of a mouse. A finding that these actions are sophisticated is tantamount to declaring that all basic and universally understood online activities are sophisticated. The use of the internet and technology is so universal and widespread that expansion of the sophistication sentence enhancement to basic activities involving email,

social media, and a website would envelope nearly all fraud cases, with very few exceptions. U.S. v. Executive Recycling, Inc., 953 F.Supp. 2d 1138, 1167 (D. Colo. 2013) ("if the Court were to find that the use of a website—particularly one as rudimentary as Executive Recycling's website—constituted 'sophisticated means', then the enhancement would apply in nearly every fraud case, which surely could not have been the Sentencing Commission's intent when it adopted this enhancement guideline.").

Moreover, to the extent that the Government seeks an enhancement because Russell reached out to many of his victims via mass-mailings (i.e. emails, letters, and social media), such an enhancement is particularly inappropriate here. The Government and Russell already agreed in the Plea Agreement to a 2-point enhancement under U.S.S.G. § 2B1.1(b)(2)(A) because Russell's offense involved ten or more victims. To now use the fact that there was a mass solicitation involving ten or more victims to bolster its argument in favor of an additional 2-point sophistication enhancement would in fact results in a 4-point enhancement for the same conduct. That is not the law and is inconsistent with the Guidelines.

Beyond the fact that the execution of Russell's scheme was extremely simplistic, he also did not attempt to conceal his scheme. He set up no fictitious entities, corporate shells, or offshore financial accounts for the funds he took in. Of the money wrongfully converted, the great majority (over two thirds) simply was transferred directly to either Russell's personal checking or savings account at CitiBank, and the rest either paid personal expenses directly or was taken out in cash. Nothing was done to disguise the fraud. Further, as pointed out by the Government in the Plea Agreement, many of the Citizens Bank accounts at issue were in his name (i.e. Harald Taub DBA Harold Taub Keeping Ohio in Republican Control (KOIRC), Harold Taub DBA Taub Victory Fund, Harold Taub DBA Putting New England First (PNEF),

and Harold Taub DBA Tested and Trusted). See United States v. Taub, 19-cr-00015-WES-PAS, ECF No. 2, at 3. The Government was able to trace the diversion of funds simply by examining the bank records of the PACs and Russell. Further, the fact that Russell never registered the PACs ore filed any reports with the FEC lend further support to the idea that his scheme lacked sophistication. His failure to register as a PAC and file any FEC reports made his fraud much more easily detectable by the Government. Finally, the fact that Russell did not attempt to file any false reports to the FEC shows the simplicity behind his scheme and the fact that he did not attempt to conceal it.

The Probation Department, in the PSR, further demonstrate the lack of sophistication in Russell's crimes. The PSR notes that "Taub converted to personal use more than $1 million of the more than $1.6 million donated to KAIRC and KOIRC, either as direct transfers to Taub's personal checking account, cash withdrawals from PAC accounts, or by personal expenditures made directly from PAC accounts. From KAIRC and KOIRC accounts, Taub transferred more than $715,000 directly into his personal checking and savings accounts, withdrew nearly $100,000 in cash, and paid more than $217,000 in personal expenses, including tens of thousands of dollars on international and domestic travel, hotels, restaurants, clothing, cigars, adult entertainment and escort services." See PSR, at ¶ 29. He did not attempt to hide any of the money, and in fact, he transferred most of it directly to his personal accounts.

U.S. v. Brown, 877 F.Supp.2d 736, 752 (D. Minn. 2012), is illustrative. There, the court found that a wire fraud scheme was not sophisticated because defendant simply obtained money from prospective investment clients by making false representations concerning what would be done with the investments and then converting the money to personal use. In that case, the defendant set up an investment fund and solicited investments by claiming the investments

would be in bonds yielding 8-9% return, but instead used the money to buy a condominium for herself and her daughter. Id. at 741-45. During sentencing, the district court found that a sophisticated means enhancement should not be applied. First, the court noted that the defendant did not create fictitious entities, corporate shells, or offshore financial accounts for [the funds'] assets, "but rather opened readily identifiable accounts at local banks." Id. at 752; see also U.S. v. Lewis, 907 F.Supp. 683, 688 (S.D.N.Y. 1995) (finding no sophistication partially due to Government failing to prove that defendant created any shell corporations in order to build a paper trail that would shield the nature of the transactions and the identity of those in control of the transactions). Second, the district court in Brown noted that defendant's fraud "was easily detectable by authorities eight months after it began." Brown, 877 F.Supp. at 752; see also Lewis, 907 F.Supp. at 688 ("While the accounting firm created bank accounts in fictitious names, it was not difficult to determine who opened the accounts, who controlled the accounts, and whose checks were deposited in the accounts.").

Further, while Russell's scheme involved repeated solicitations to many potential donors, repetitive conduct alone does not indicate sophisticated means. The court in Lewis noted that "[w]hile it is true that [defendant] wrote 178 checks totaling $154,839.07 to 26 different payees over eight years, repetitive conduct alone does not mean that he used 'sophisticated means' to impede discovery of the nature or extent of the offense." Lewis, 907 F.Supp, at 688; see also U.S. v. Kaufman, 800 F.Supp. 648 (N.D. Ind. 1992) ("[T]he court does not believe repetitive conduct demonstrates 'sophisticated means.'"). Likewise, while Russell's conduct might have been repetitive in nature, it is not indicative of any level of sophistication. The same uncomplicated process was simply repeated with no particular effort to hide fraudulent acts.

Russell's actions, while wrong, were simplistic and do not meet the definition of

sophistication, either in the execution of the offense which was made up of a single step or in the concealment of the offense, of which there was none.

### V.   A Variance Sentence Rather Than a Guidelines Sentence Should be Imposed

#### 1.   The Sentencing Guidelines Substantially Overstates the Seriousness of the Offense

The greater part of the severity of the Guidelines calculation in Russell's case is due to the points applied from the amount of the loss calculation. Courts, however, have noted that these loss calculations sometimes unfairly drive up significantly the offense level and the Guidelines sentencing range. See United States v. Emmenegger, 329 F.Supp. 2d 416, 427-428 (S.D.N.Y. 2004) ("[t]he Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the Guidelines provisions for theft and fraud place excessive weight on this single factor, attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes— to assign precise weights to the theft of different dollar amounts.").

Further, §2B1.1, Application Note 20(C) states "[t]ere may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." Application Note 20(C) goes as far as providing an example of such a situation where a downward departure may be warranted. The Note states that "[f]or example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce

25

an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted." Russell's conduct, while wrong, fits the example provided by the Sentencing Guidelines. The vast majority of the donors to KAIRC and KOIRC donated in small amounts. Further, many of the victims do not consider even consider themselves victims and have written letters in support of Russell. Indeed, only 13 donors responded to the Government's request regarding restitution. This further demonstrates that most of Russell's victims do not consider themselves victims.

### 2.  Avoidance of Sentencing Disparities

Courts will take into account the need to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C § 3553(a)(6)

The United States Sentencing Commission provides statistics regarding sentences for generally similar offenses. The statistics provided by the United States Sentencing Commission show that over 70% of fraud sentences in the District of Rhode Island in 2017 resulted in sentences below the Guidelines range. See United States Sentencing Commission Statistical Information Packet Fiscal Year 2017 District of Rhode Island (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2017/ri17.pdf). Further, according the United States Sentencing Commission, 50% of the sentences imposed for fraud in 2017 were non-guideline sentences as a result of Booker. See id; see also United States Sentencing Commission Statistical Information Packet Fiscal Year 2016 District of Rhode Island (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2016/ri16.pdf) (50% of the sentences imposed for fraud in 2016

were below the Guidelines range). Indeed, based on ████████████████████ as well

as being a first-time offender, he is the exact type of Defendant that warrants the mercy of the

court with a below-Guidelines sentence.

Specifically, the Court in this District has sentenced defendants convicted of similar

charges to sentences below the corresponding sentencing Guidelines range. See, e.g., United

States v. Kent, 17-cr-00121-WES-PAS, ECF No. 33. In Kent the Probation Department

calculated the guideline range to be 63-78 months, while the plea agreement called for a 60-

month sentence. See United States v. Kent, 17-cr-00121-WES-PAS, ECF No. 26, at 1. The

defendant in Kent was ultimately sentenced to 48-months in prison, well below the Guidelines

range and the sentence the government was seeking. Thus, this Court gave Mr. Kent a sentence

over 20% below the lowest range in the sentencing Guidelines. A 24-month sentence for Russell

would similarly be a sentence slightly over 20% below the applicable sentencing Guidelines.

Further, in Mr. Kent's case, only 24-months out of the 48-month sentence was related to the wire

fraud count, which was based on a more sophisticated fraud causing a loss of over $3.5 million,

much higher than the loss caused by Russell.

This conclusion is buttressed by consideration of the factors used to determine whether

Russell's sentence should be subject to a sophistication enhancement under section

2B1.1(b)(10)(C) of the Guidelines.  Russell's means were certainly not sophisticated, as

demonstrated in Section IV(2), above.

**3.**   ████████████████████████████████

For the reasons stated ████████████████, Russell requests that his sentence be

served in a "halfway house" or "community correctional center." See Exhibit C. As noted

previously, the primary sentencing mandate of §3553(a) directs the sentencing court to impose

the minimally sufficient sentence to achieve the statutory purposes of punishment, that is justice, deterrence, incapacitation and rehabilitation. As illustrated above, and explained below, these goals will best be served by Russell serving his complete sentence in a halfway house.

███████████████████████████████████████████████████████████████

██████████████████████ While Russell agrees that he must be punished for his actions, serving his sentence in a federal prison is likely to impede the justice system's goal of rehabilitation, and may affect Russell's ability to be a functioning member of society once he has served his sentence.

While Russell is seeking a non-Guidelines sentence by asking to serve his full sentence in a halfway house, a halfway house is still a recognized form of incarceration. The First Circuit has found that placement in a halfway house or community correctional center qualifies as a penal or correctional facility. Goldings v. Winn, 383 F.3d 17, 25-28 (1st Cir. 2004). The First Circuit continued that "[a] community correction center is a correctional facility and therefore may serve as a prisoner's place of imprisonment.' Id. at 28.[9] While sentencing Russell to a halfway house is a non-Guidelines sentence, it still is a place of imprisonment and will best allow for the justice system to meet its goals in sentencing and imprisonment.

**VI.    Conclusion**

Russell understands that he has committed serious crimes. While his ██████████ is not an excuse, it is an explanation. Russell understands that he must be punished but it is his hope that his punishment will also put him in a position to be a contributing member of society. He wants to pay his debt to society. Upon his release, he wants to pay the restitution to his victims.

---

[9] Goldings v. Winn also held that a halfway house or community corrections center was a place of imprisonment for those offenders besides Zone C and D offenders defined in 5C1.1 of the United States Sentencing Guidelines. This case, however, was decided prior to U.S. v. Booker, which made the Sentencing Guidelines advisory only. Therefore, a non-Guidelines sentence of a halfway house was impossible at the time, but is now available to the Court.

For all of the above reasons, Russell respectfully requests that that the Court impose a sentence of 24 months in a halfway house, 18 months of probation and up to $100,000 in restitution.

Respectfully submitted,


_____ /s/ Eric R. Levine _____
Eric R. Levine

EISEMAN LEVINE LEHRHAUPT
   & KAKOYIANNIS, P.C.
805 3rd Ave
New York, N.Y. 10022
(212) 752-1000


_____ /s/ Jeffrey B. Pine _____
Jeffrey B. Pine

LYNCH & PINE LLC
1 Park Row, 5th Floor
Providence, RI 02903
(401) 274-3306

*Attorneys for H. Russell Taub*